# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| YOLANDA RATCHFORD | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TYTIANNA SMITH, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CASEY CHAMBLEY, in his individual capacity; | ) | |
| JEFFERY FINCH, in his individual capacity; | ) | |
| LEONARD RILEY, in his individual capacity; | ) | CASE NO. \_\_2:25-cv-351_____ |
| CHARLES REYNOLDS, A/K/A MIKE | ) | |
| REYNOLDS, in his individual capacity; CHRIS | ) | |
| DANIEL, in his individual capacity; | ) | JURY TRIAL DEMANDED |
| CHRISTOPHER C. DAVIS, in his individual | ) | |
| capacity; LORENZO HARRIS, in his individual | ) | |
| capacity; MICHAEL MEACHAM, in his individual | ) | |
| capacity; STACY SHIREY, in his individual | ) | |
| capacity; DAVID G. SMITH, in his individual | ) | |
| capacity; RICKY D. SPRUILL, in his individual | ) | |
| capacity; SHARON WELDON, in her official | ) | |
| capacity; THE CHAMBERS COUNTY BOARD | ) | |
| OF EDUCATION; CHAMBERS COUNTY, | ) | |
| ALABAMA; and THE CITY OF VALLEY, | ) | |
| ALABAMA, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## COMPLAINT

By their attorneys, Plaintiffs Yolanda Ratchford and Tytianna Smith ("Plaintiffs") allege

as follows:

<u>BACKGROUND AND NATURE OF THIS ACTION</u>

1.      Plaintiffs were born and raised in Alabama.  They are upstanding, public-spirited citizens who have long been involved in community affairs.  Among other things, in a variety of forums, they have advocated for equal opportunity for and fair treatment of students and teachers in LaFayette, a predominantly Black city in Chambers County, Alabama.

2.      In 2023, the Chambers County Board of Education announced that it planned to consolidate the LaFayette and Valley high schools into a single high school in Valley, a predominantly White city.  Out of concern about the disproportionate burden on LaFayette students and teachers, on a number of occasions starting in 2023, Plaintiffs protested against the proposed Valley site for the consolidated school and helped organize others to communicate their objections to the officials responsible through peaceful demonstrations and other activities.

3.      These demonstrations took place against a backdrop of racial discrimination and the 50-year struggle to desegregate Alabama's public schools, including the following:

      a.      In 1964, finding that there was "a dual school system based upon race" throughout the State of Alabama and that Governor George C. Wallace and other state officials were attempting "to prevent or impede" school desegregation, this Court enjoined the government officials "from interfering with court-ordered desegregation anywhere in the State of Alabama." (*Lee v. Macon Cnty. Bd. of Educ.*, 231 F. Supp. 743, 750, 755, 757 (M.D. Al. 1964)).

      b.      In 1967, finding that "the evidence . . . [was] absolutely overwhelming that the State Board of Education and the Alabama Superintendent of Education . . . ha[d] exercised extensive control over school construction and consolidation in such a manner as to perpetuate a dual public school system

based upon race . . . [and that t]his discriminatory course of conduct on the part of these defendants ha[d] continued and persisted since th[e] Court's order of July 1964," the Court ordered the Alabama State Board of Education and other defendants to "take affirmative action to disestablish all state enforced or encouraged public school segregation and to eliminate the effects of past state enforced or encouraged racial discrimination in their activities and their operation of the public school systems throughout the State." (*Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 461, 471, 480 (M.D. Ala. 1967)).

c.     Under a 1993 Consent Order, this Court required the Chambers County School District to establish a consolidated high school including students from the (predominantly White) City of Valley and the (predominantly Black) City of LaFayette.

d.     In 2023, finding that the Chambers County School District's plan to close LaFayette High School and temporarily to require its students to attend Valley High School would disproportionately burden the Black students at LaFayette High School, this Court blocked that aspect of the Chambers County Board of Education's proposed plan, while approving the proposed long-term consolidation of the district's two public high schools into a single new high school in Valley.  (*Lee v. Chambers Cnty. Bd. of Educ.*, 693 F. Supp. 3d 1223, 1253–54 (M.D. Ala. 2023)).

4.     Although Plaintiffs' protests and other activities were protected under the First Amendment's rights of free speech and peaceable assembly, senior policy-making officials and

police officers of Chambers County and the City of Valley nevertheless retaliated against them and restrained them from continuing to protest peacefully.  As more fully set forth below, the Defendants hatched and executed a plan resulting in Plaintiffs' arrest without probable cause, mistreatment, and humiliation.

5.    Plaintiffs bring this action (the "Action") to redress, among other things, the Defendants' flagrant violation of their rights under the First and Fourth Amendments of the United States Constitution and the rights of Plaintiff Ratchford under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act.  Plaintiffs also allege pendent state claims.

6.    Key events giving rise to this lawsuit include the following:

a.    On November 15, 2023, without probable cause to conclude that the Plaintiffs had committed a crime, Defendants Reynolds, Daniel, Davis, Harris, Meacham, Shirey, and Smith (collectively referred to below as the "Arresting Officers") arrested Plaintiffs for silently and unobtrusively sitting in a public school board meeting, each holding an 8.5 x 11" piece of paper with an image of John Lewis and the words "Good Trouble."

b.    In so doing, the Arresting Officers violated Plaintiffs' First and Fourth Amendment rights and carried out a premeditated plan to retaliate against Plaintiffs for having exercised, and to prevent Plaintiffs from further exercising, their First Amendment rights of free speech and peaceable assembly.

c.    The Arresting Officers took Plaintiffs to a police station in Valley, where they failed to accommodate Plaintiff Ratchford (who is paralyzed from the waist down and wheelchair-bound and who, as some of the Defendants

knew, has bladder problems) by providing an accessible toilet for so long that she was forced to urinate on herself.

PARTIES

7.    Having spent most of her life in LaFayette, Alabama, where she graduated from LaFayette High School, Plaintiff Yolanda Ratchford earned a B.A. degree in political science with honors from Alabama State University and received an M.S. degree in justice and public safety, with a concentration in judicial administration, from Auburn University at Montgomery.

8.    Ms. Ratchford is a mother with a long record of public service and public engagement in her communities.  She worked for over 14 years in social services as a caseworker with the Lee County Department of Human Resources and the Chambers County Department of Human Resources in the areas of child welfare, adult protective services, and financial support eligibility.  She was also a committee clerk for the Alabama House Judiciary Committee.  In 2012, she ran for the office of Chambers County Circuit Clerk.

9.    Since March 2021, Ms. Ratchford has been paralyzed from the waist down, wheelchair-bound and disabled.  She nevertheless remains active in public affairs in Chambers County, where she is well known for her community engagement.

10.    Born and raised in LaFayette, Alabama, where she still lives, Plaintiff Tytianna Smith was the valedictorian of her LaFayette High School class.  She attended Norfolk State University where she again graduated first in her class, with a perfect 4.0 GPA.  She completed an intensive post-baccalaureate pre-med program at Johns Hopkins University, graduating as the only Black person in her class.  At the time of the events described below, she was a science teacher at LaFayette High School and then at Valley High School.  Like Ms. Ratchford, Ms. Smith has long been active in civic affairs.

11.     At the time of the events in question, Defendant Casey Chambley was the Superintendent of the Chambers County School District.

12.     At the time of the events in question, Defendant Jeffery Finch was the President of the Chambers County Board of Education.

13.     Defendant Leonard Riley is the Mayor of the City of Valley.

14.     Defendant Charles Reynolds, a/k/a Mike Reynolds, is the Police Chief of the City of Valley Police Department.

15.     Defendant Chris Daniel is a captain with the City of Valley Police Department.

16.     Defendant Christopher C. Davis is a lieutenant with the City of Valley Police Department.

17.     Defendant Lorenzo Harris is a detective lieutenant with the City of Valley Police Department.

18.     Defendant Michael Meacham is a sergeant with the City of Valley Police Department.

19.     Defendant Stacy Shirey is a captain with the City of Valley Police Department.

20.     Defendant David G. Smith is a detective sergeant with the City of Valley Police Department.

21.     Defendant Ricky D. Spruill is a police officer with the City of Valley Police Department.

22.     Defendant Sharon Weldon, the Superintendent of the Chambers County School District, is sued in her official capacity.  The Chambers County School District is a public entity within the meaning of Title II of the ADA.

23.     Upon information and belief, the Chambers County Board of Education and the Chambers County School District are the recipients of federal financial assistance under the Rehabilitation Act of 1973.

24.     Defendant Chambers County Board of Education (sometimes referred to below as the "Board of Education") is the school board for the Chambers County School District and a decision-making body of Chambers County, Alabama.  Defendant Chambers County Board of Education bears responsibility for the operation, management, and control of the Chambers County School District.

25.     Defendant Chambers County is a subdivision of the State of Alabama.

26.     Defendant the City of Valley is a municipality in southeastern Alabama.

<u>JURISDICTION AND VENUE</u>

27.     Under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), this Court has jurisdiction over this Action arising under the Constitution and laws of the United States and to redress the deprivation of rights secured by the Constitution of the United States.

28.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Counts VII and VIII, which are so related to the claims in this Action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

29.     This Court has jurisdiction over Counts V and VI, which arise out of Title II of the ADA, 42 U.S.C. § 12132 *et seq.*, Title III of the ADA, 42 U.S.C. § 12182 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*.

30.     Under 28 U.S.C. § 1391, venue is proper in that the events or omissions giving rise to the Plaintiffs' claims occurred in Chambers County, Alabama, in the Eastern Division of the Middle District of Alabama.

FACTS

*Chambers County Has a Long, Sad History of*
*Racial Segregation and Discrimination in Public Schools.*

31.     For decades, the Black citizens of Chambers County have struggled to overcome

racist barriers so that they might benefit from the same educational resources available to White

citizens.

32.     Historically, the school district endowed the high school in Valley, which had a

predominantly White population, with greater resources than those of LaFayette High School,

which has long had a predominantly Black student body.  The disparities between the two schools

were a living example of the "dual school system based upon race" throughout Alabama that, in

its 1967 ruling, this Court enjoined, but which continued long after.  *Lee v. Macon County Bd. of*

*Educ.*, 267 F. Supp. 458, 460, 482 (M.D. Ala. 1967) (mandating that Alabama's school districts,

including in Chambers County, desegregate their schools) (*per curiam*), *aff'd sub nom*, *Wallace v.*

*United States*, 389 U.S. 215 (1967) (*per curiam*).

*The Board of Education Decides to Consolidate LaFayette High School and Valley High*
*School in the Predominantly White City of Valley.*

33.     Under a desegregation order dating back to 1970 in *Lee v. Macon County Board of*

*Education* (originally filed in 1963 and still pending, in pertinent part, as *Lee v. Chambers County*

*Board of Education*, Case No. 3:70-cv-00844-WKW (M.D. Ala.)), the Board of Education has

been under the supervision of this Court for more than 50 years.

34.     In 1994, the Court's denial of the City of Valley's request for a separate school

system triggered a provision from a 1993 Consent Order mandating the creation of a consolidated

high school.

35.     In 2023, this Court "sustained [the] [p]laintiffs' objections to the Board's plans to

merge the student bodies of LaFayette High School and Valley High School on the campus of

Valley High School during construction of the new high school because those plans create[d] an undue burden on the black students at LaFayette High School." *Lee v. Chambers Cnty. Bd. of Educ.*, 693 F. Supp. 3d 1223, 1228 (M.D. Ala. 2023).  However, the Court approved the plan for the district's two public high schools—LaFayette High School (located in a predominantly Black community) and Valley High School—to be combined into a single high school in Valley.

36.    Nevertheless, the proposed location of the new school remained a cause of concern to residents of LaFayette, including the Plaintiffs.  The Valley location would require students and teachers who live in LaFayette to spend almost two hours every day commuting.  Some residents of LaFayette urged Chambers County to build the new school in a different location that was more accessible to students and teachers residing in LaFayette.

*Plaintiffs Organize LaFayette Teachers to Protest Proposed School Location.*

37.    In or around December of 2022, Ms. Smith and other teachers created LaFayette Teachers Against Displacement ("LTAD") to call the needs and interests of LaFayette-based students and teachers to the attention of the Board of Education.  Subsequently, Ms. Ratchford joined LTAD.  LTAD opposed locating the proposed new Chambers County consolidated high school in Valley.

38.    Starting in or around January 2023, LTAD (which later changed its name to the Chambers County Equity Initiative) organized demonstrations and marches to urge the Board of Education to recognize and respond appropriately to the needs of the children and teachers in LaFayette.

*Public Officials Retaliate Against LTAD.*

39.    On or around August 23, 2023, September 27, 2023, and October 25, 2023, LTAD held peaceful protests at Board of Education meetings.  At or outside these meetings, LTAD demonstrators attempted to make their concerns and positions known, including by speaking at the

meetings, holding signs, chanting, playing music or symbolically tying bandanas around their wrists. Sometimes, after an LTAD representative had spoken at these meetings, protestors would chant slogans such as "no equity, no peace," "good trouble" and "no racism." When the LaFayette police officers told them that they could not chant or hold signs in the meeting, they stepped outside. At all such meetings, the Board of Education continued to conduct its business.

40. Upon information and belief, before the October 25, 2023 meeting, Defendants Chambley and Finch, who disagreed with the viewpoints of the LTAD protestors, told Jeff Nelson, the Sheriff of Chambers County, to arrest the LTAD protestors for holding signs. Sheriff Nelson responded that only the municipal police departments (of LaFayette or Valley (wherever the meeting was held)) had jurisdiction to arrest demonstrators.

41. Before the October 25, 2023 meeting, Sheriff Nelson had approached Ms. Smith and her brother, Dr. Travis Smith (who was also a member of LTAD), and told them that they were no longer allowed to protest, including by holding signs during the Board of Education meetings.

42. Upon information and belief, Defendant Finch, Defendant Chambley, and/or others acting in concert with them, arranged for the drafting of a memorandum of understanding between the City of LaFayette and the Chambers County Board of Education (the "LaFayette MOU").

43. Upon information and belief, the LaFayette MOU, which LaFayette Mayor Kenneth Vines signed, provided that the LaFayette Police Department would be responsible for preventing any disruptions by protesters at future Chambers County School District Board of Education meetings, and that LaFayette police officers were responsible for confiscating the signs of demonstrators.

44.     Pursuant to the LaFayette MOU, during the October 25 Board of Education meeting in LaFayette, LaFayette police officers did, in fact, remove signs.

45.     The agreement between the Board of Education and the LaFayette Police Department to restrict peaceful demonstration to prevent purportedly anticipated disruptions was an arrangement to effectuate a *per se* unconstitutional prior restraint, in violation of the LTAD members' (including Plaintiffs') First Amendment rights of free speech and peaceable assembly and their right to petition for a redress of grievances.

46.     At a November 6, 2023 LaFayette City Council meeting, council members raised concerns about the LaFayette MOU and the conduct of LaFayette police officers during the October 25, 2023 Board of Education meeting.  Among other things, Councilman Terry Mangram said that use of signs during Board meetings was a legitimate form of protest, despite having been banned at the request of Defendants Finch and Chambley.  Councilman Michael Ellis noted that residents had complained about the LaFayette Police Department's treatment of demonstrators and about not having been forewarned that LaFayette Mayor Vines would sign the LaFayette MOU. Councilman Toney Thomas stated that he had personally participated in the prior LTAD demonstrations and had never witnessed any behavior that could be described as "disruptive." Councilwoman Tammie Williams said that she had been at every Board meeting where LTAD had engaged in demonstrations, all of which were peaceful.

47.     In addition to instigating the confiscation of LTAD demonstrators' signs at the October 25, 2023 meeting, the Board of Education took other retaliatory actions against members of LTAD.  For example, upon information and belief, in late June of 2023, Defendant Chambley, or others acting under his direction, transferred Ms. Smith from LaFayette High School to Valley High School, a much less convenient location, adding almost an additional hour of commuting

time daily and requiring her to wake up an hour earlier due to the time zone difference between LaFayette, where she lives, and Valley.  Upon information and belief, Defendant Chambley's professed reason for Ms. Smith's transfer—the purported need for such a teacher in Valley—was a pretext, the real motivation being to retaliate against Ms. Smith for the views she had expressed and her membership in LTAD.

48.    Upon information and belief, other teachers feared that joining LTAD or protesting the Board of Education's decision to locate the combined high school in Valley would make them targets of Chambley and Finch's vengeance.  The potential for retaliation against those who supported LTAD deterred some from participating in LTAD's protests.  For example, before a demonstration at a Board of Education meeting on November 15, 2023, one individual told an LTAD demonstrator:  "I support you anyway, I just like my job."

*Senior Policy-Making Officials Communicate That, at the November 15 Meeting, LTAD Protestors May Commit "Disorderly Conduct," Which "Will Not Be Tolerated."*

49.    Upon information and belief, in anticipation of the November 15, 2023 Board of Education meeting in Valley, Defendant Chambley or Defendant Finch arranged for the drafting of a new memorandum of understanding (or the revision or adaptation of the prior memorandum of understanding) between the Board of Education and the City of Valley (the "Valley MOU").  In any event, the Valley MOU was similar to the LaFayette MOU in material respects.

50.    On November 8, 2023, in a communication that was not privileged (or as to which any privilege has since been waived by disclosure to third parties), Robert T. Meadows, III, counsel to the Board of Education, sent the draft Valley MOU to Defendant Chambley.

51.    On November 9, 2023, Defendant Chambley sent a draft of the Valley MOU to Defendant Riley, who forwarded it to Robin Butts, Human Resources Manager for the City of Valley.  The same day, at Defendant Riley's request, Ms. Butts forwarded the draft Valley MOU

to Defendant Reynolds, Police Chief of the City of Valley Police Department, and Larry Nix, City Attorney for the City of Valley.

52.     While it appears to have been carefully word-smithed by lawyers in anticipation of potential First Amendment claims, the version of the Valley MOU that has been made available to Plaintiffs' counsel nevertheless included these recitals, among others:

> "WHEREAS, the Board desires to maintain an appropriate atmosphere for the conduct of its business at its regularly scheduled board meeting to be held at the Langdale Auditorium in Valley, Alabama; and,

> "WHEREAS, there have been citizens at the last two board meetings who have disrupted in one way or another the conduct of business at the board meetings; and,

> "WHEREAS, the City through its police department enforces the laws in the City; and,

> "WHEREAS, *the citizens in certain situations could be guilty of disorderly conduct* or other criminal offenses; and,

> "WHEREAS, neither the City nor the Board want to initiate criminal proceedings against the citizens; and,

> "WHEREAS, nevertheless the Board must have the ability to conduct its business at its Central Office without disruption . . . ."

(Emphasis added.)

53.     The Valley MOU (or a draft or version of the Valley MOU) was circulated among and, on information and belief, discussed by Defendants Chambley, Finch, Riley, and Reynolds, among others.  Regardless of whether the Valley MOU was ever signed, on information and belief, with or without other communications among the Defendants or some of them, it was a basis for the Defendants' unlawful and unconstitutional actions against Plaintiffs on November 15, 2023.

54.     On November 9, 2023, Larry Nix sent to Defendant Riley a short notice (the "Short-Form Notice") "to be posted on the City's webpage and/or distributed, published or posted as the

Mayor deems appropriate."  Defendant Riley subsequently forwarded the Short-Form Notice to Defendant Reynolds.

55.     Upon information and belief, Defendant Riley and/or the City of Valley caused the Short-Form Notice to be posted to the City of Valley website and its Facebook page for public consumption.  It included the following paragraph:

> The Chambers County Board of Education will hold a meeting at the Langdale Auditorium in the City of Valley on Wednesday, November 15, 2023 at 5 P.M. EST. The City has been informed that there have been disruptions by protestors at previous Board of Education meetings which were not held in the City of Valley . . . . Breaches of the peace and/or *disorderly conduct will not be tolerated*.

(Emphasis added.)

56.     On November 10, 2023, Cookie Thomas, the Administrative Assistant to Defendant Chambley when he was Superintendent of Education, sent a longer notice (the "Notice") to Defendants Riley and Reynolds, stating that "Dr. Chambley asked that I email both of you the attached copy of our public notice concerning the possible protest at the November 15, 2023 board meeting . . . ."  Several hours later, Defendant Riley forwarded the Notice to Defendant Reynolds.

57.     On or around the same day, Defendant Chambley and/or the Board of Education caused the Notice to be posted to the Chambers County School District website for public consumption.  It included the following paragraphs:

> The Chambers County Board of Education will hold a meeting at the Langdale Auditorium in the City of Valley on Wednesday, November 15, 2023, at 5:00 P.M. EST. . . . Breaches of the peace *and/or disorderly conduct* will not be tolerated.
>
> The Board asks that any protesters . . . [l]eave any placards *and/or signs* outside the board room/auditorium . . . .

(Emphasis added.)

58. Thus, Chambers County and City of Valley senior policy-making officials and/or their counsel directly or indirectly circulated among themselves and transmitted to the City of Valley Police Chief and the Valley Police Department at least three documents mentioning the possibility of demonstrators engaging in "disorderly conduct" at the November 15, 2023 Board of Education meeting.

59. The statements in these documents that "there have been citizens at the last two board meetings who have disrupted in one way or another the conduct of business at the board meetings," "there have been disruptions by protestors at previous Board of Education meetings," and "there have been disruptions by protestors" were oblique but unmistakable references to Plaintiffs and other LTAD members, and they were misleading.

60. The Valley MOU, the Notice, and the Short-Form Notice evince a premeditated policy of senior policy-making officials Defendants Chambley, Finch, and Riley, the Board of Education, and the City of Valley to shut down peaceful demonstrations, unconstitutionally restrain Plaintiffs' protected speech and free assembly, and punish protestors at the November 15, 2023 meeting.

*Ms. Ratchford and Ms. Smith Silently and Peaceably*
*Demonstrate at the November 15 Board of Education Meeting.*

61. On November 15, 2023, Ms. Ratchford and Ms. Smith attended the Board of Education meeting at the Langdale Auditorium in the City of Valley, Alabama, at which, among other things, "teacher of the year" awards were to be presented.

62. At least seven police officers were there, including Defendants Reynolds, Davis, Daniel, Meacham, Smith, Harris, and Shirey, all of whom, upon information and belief, participated in "escorting" the Plaintiffs out of the building after they were arrested.  Ms. Ratchford

and Ms. Smith, who were the only LTAD demonstrators present at the November 15, 2023 Board of Education meeting, felt intimidated by the extraordinary police presence.

63.    When Ms. Ratchford and Ms. Smith attempted to enter the auditorium holding placards saying "Congratulations Teachers" and "Teachers for Equity," or words to that effect, Defendant Daniel told them that they could not bring those signs into the auditorium.  Ms. Ratchford and Ms. Smith left those placards outside the building.

64.    The Board of Education hosted the meeting at Langdale Auditorium, which had only a staircase, and no ramp, at the main entrance to the Auditorium.  Being confined to a wheelchair, in the absence of a ramp or other suitable accommodation, Ms. Ratchford was unable to enter the Auditorium on her own without being carried up the stairs.  Defendants Harris and Daniel carried her up the stairs in her wheelchair.

65.    After a moment of silence, the Pledge of Allegiance, and a few other short agenda items, the first part of the meeting was devoted to giving various awards and plaques to teachers and other employees of the school district.  Following the celebration of teachers, there was a break in proceedings, and attendees went outside the auditorium to take pictures.

66.    Defendant Chambley then approached Defendant Reynolds, pointed out Ms. Ratchford and Ms. Smith, and told Defendant Reynolds that they were part of the protests.

67.    Once they were back inside of the auditorium, feeling intimidated and frightened by the number of uniformed police officers, Ms. Ratchford and Ms. Smith held hands and prayed before the meeting started.

68.     When they took their seats, Ms. Ratchford and Ms. Smith covered their mouths with bandanas, as if they had been gagged, to call attention to the fact that they were being restrained from making their views known.

69.    Defendant Reynolds then approached the Plaintiffs and told them that they could not have signs, to which Ms. Smith responded that their bandanas were not signs, whereupon Defendant Reynolds walked away.

70.    A short time later, Ms. Ratchford and Ms. Smith each unfolded and silently held a letter sized image (about 8.5 x 11") of civil rights leader John Lewis, which included the words "Good Trouble" (part of a famous quotation emphasizing the importance of peaceful protest against injustice, even at the risk of arrest). The meeting continued without interruption; there was no disturbance whatsoever.

71.    Defendants Reynolds and Davis hurried back to where the Plaintiffs were sitting, and Defendant Reynolds once again informed them that they could not have signs at the meeting. Defendant Reynolds then falsely stated that the Plaintiffs were disturbing the meeting and told them to put away the letter-sized paper each was holding or leave the meeting.

72.    Ms. Ratchford asked whether she and Ms. Smith were violating the law. Defendant Reynolds stated that they were violating the disorderly conduct statute. Ms. Smith asked how they were committing disorderly conduct, to which Defendant Reynolds responded that they were violating the rules of the Board of Education meeting.

73.    When Ms. Ratchford and Ms. Smith refused to put away the letter-sized images they were displaying, Defendant Reynolds and the other Arresting Officers arrested them. Defendant Reynolds stated that, because he had asked them "to put the signs away" and they "refused to abide by the rules" (or words to that effect), they were being arrested and charged with disorderly conduct.

74.    The arrest reports completed by Defendants Reynolds, Davis, Daniel, Meacham, Harris, and Shirey state that the Plaintiffs were arrested for disorderly conduct.

75.    The Alabama disorderly conduct statute provides that "[a] person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, he or she does any of the following:

(1)    Engages in fighting or in violent tumultuous or threatening behavior.

(2)    Makes unreasonable noise.

(3)    In a public place uses abusive or obscene language or makes an obscene gesture.

(4)    Without lawful authority, disturbs any lawful assembly or meeting of persons.

(5)    Obstructs vehicular or pedestrian traffic, or a transportation facility.

(6)    Congregates with other person [sic] in a public place and refuses to comply with a lawful order of law enforcement to disperse."

Alabama Criminal Code § 13A-11-7(a).

76.    No police officer in the same situation and with the information that the Arresting Officers had could reasonably conclude that there was probable cause to arrest the Plaintiffs for disorderly conduct under Alabama law.

77.    Defendant Daniel handcuffed Ms. Smith.  Defendants Meacham, Reynolds, Daniel, Shirey, Smith, Harris, and Davis moved Ms. Ratchford and Ms. Smith outside the auditorium. Since there was no wheelchair-accessible exit, the Arresting Officers had to roll Ms. Ratchford out of Langdale Auditorium across pieces of wood covering the ground.

*Defendants Jail the Plaintiffs.*

78.    The Arresting Officers then took the Plaintiffs in separate police cars to the jail at the City of Valley Police Department.  On the date of the Plaintiffs' arrests, Defendant Spruill was the Watch Commander at the jail, and his supervisor was Defendant Davis.

79.    The officers at the jail, including, upon information and belief, Defendant Spruill, placed Ms. Smith behind bars in a holding cell.  It was small and cramped, with barely enough

space for Ms. Smith.  They kept Ms. Ratchford in her wheelchair in the same room, outside the cell.

80.    At the jail, Ms. Ratchford told one of the police officers that she needed to use the restroom.  He told another officer, who responded that he was doing paperwork and that Ms. Ratchford would have to wait.

81.    Ms. Ratchford informed the officer that she had bowel and bladder issues, at which point the officers agreed to take her to a restroom.  For some time, the officers then wheeled her around from cell to cell, none of which would accommodate a wheelchair, had a toilet with grab bars, or would otherwise be suitable for a person paralyzed from the waist down.  Finally, they took Ms. Ratchford to the administrative area, to which the general public had access but which was normally unavailable to arrestees and which was not adjacent to the jail.  By the time they got there, Ms. Ratchford had urinated on herself.  She felt physically miserable, deeply humiliated, and demeaned.

82.    Overall, the Plaintiffs' ordeal at the jail was uncomfortable, embarrassing and degrading.  They were held for over an hour before being released on their own recognizance.

*The Plaintiffs are Fully Acquitted at Trial.*

83.    Without probable cause, the Plaintiffs were prosecuted for disorderly conduct and, on February 14, 2024, the case was tried in LaFayette before Judge Steven R. Perryman of Alabama's Fifth Judicial Circuit.

84.    At the close of the evidence, Judge Perryman dismissed all charges.  From the bench, he commented that, if anyone had engaged in disorderly conduct at the November 15, 2023 Board of Education meeting, it was the police officers who arrested Ms. Ratchford and Ms. Smith.

CLAIMS FOR RELIEF

COUNT I

Fourth Amendment False Arrest Claim Under 42 U.S.C. § 1983

(Against Defendants Reynolds, Davis,
Daniel, Meacham, Smith, Harris, and Shirey)

85.    Plaintiffs incorporate by reference paragraphs 1 through 10, 14-20, 27, 30, and 49 through 84.

86.    Defendants Reynolds, Davis, Daniel, Meacham, Smith, Harris, and Shirey, acting under color of state law, unlawfully and unconstitutionally arrested the Plaintiffs without probable cause.

87.    No police officer in the same situation and with the same information could reasonably conclude that there was probable cause to arrest the Plaintiffs for disorderly conduct under Alabama law.

88.    Among other things, there was no basis on which a reasonable officer could conclude that the Plaintiffs were disturbing a lawful assembly by protesting silently and peaceably, while the Board of Education meeting proceeded as planned, unimpeded.

89.    Nor was there a basis on which a reasonable officer could conclude that Ms. Ratchford and Ms. Smith were congregating with other persons in a public place and refusing to comply with a lawful order to disperse.  Any order to disperse by the Arresting Officers was unconstitutional, unlawful, and enforced selectively against the Plaintiffs because of their views and their membership in LTAD.  No such order, nor the supposed limitation on which it was based, was a narrowly tailored time, place, and manner restriction.

90.    The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

91.     As a result of Defendants' conduct referred to in this Count, the Plaintiffs have suffered mental anguish, physical and emotional pain and suffering, loss of liberty, financial loss (due to, among other things, the attorneys' fees they were forced to incur to defend themselves against baseless charges brought without probable cause), and other grievous and continuing injuries and damages in an amount to be proven at trial.

## COUNT II

### First Amendment Retaliation Claim Under 42 U.S.C. § 1983

(Against Defendants Riley, Chambley, Finch, Reynolds,
Davis, Daniel, Meacham, Smith, Harris, and Shirey)

92.     Plaintiffs incorporate by reference paragraphs 1 through 20, 27, and 30 through 84.

93.     As retaliation for the Plaintiffs' exercise of their First Amendment rights of freedom of speech and of assembly, acting under color of state law and without probable cause, Defendants Riley, Chambley, Finch, Reynolds, Davis, Daniel, Meacham, Smith, Harris, and Shirey deliberately arrested Plaintiffs, assisted in or caused their arrest.

94.      Plaintiffs would not have been arrested but for the exercise of their First Amendment rights.

95.     In addition, Defendants Chambley and Finch retaliated against Ms. Smith and others by taking actions adverse to their conditions of employment because they had exercised such rights.

96.     The intentional actions of Defendants Riley, Chambley, Finch, Reynolds, Davis, Daniel, Meacham, Smith, Harris, and Shirey in initiating and falsely arresting the Plaintiffs violated the Plaintiffs' First Amendment rights of free speech and to petition for a redress of grievances.

97.     The Defendants' initiation of and arrest of the Plaintiffs and retaliatory actions of Defendants Chambley, Riley, and Finch would likely deter a person of ordinary firmness from the exercise of First Amendment rights, including but not limited to expressing views that are unpopular with the controlling government.

98.     A substantial or motivating factor for the Plaintiffs' arrest without probable cause was their expressed viewpoints and the exercise of their rights to peaceably assemble and to petition the government for a redress of grievances.

99.     The Defendants named in this Count committed the misconduct described above willfully and with malice and reckless indifference to the rights of others.

100.    As a result of Defendants' conduct referred to in this Count, the Plaintiffs have suffered mental anguish, physical and emotional pain and suffering, loss of liberty, financial loss (due to, among other things, the incurrence of attorneys' fees to defend themselves against baseless charges brought without probable cause), and other grievous and continuing injuries and damages in an amount to be proven at trial.

<u>COUNT III</u>

*Monell* Claim Under 42 U.S.C. § 1983 for Violations of the Plaintiffs' First Amendment Rights <u>and for Retaliation Against Plaintiffs for Having Exercised Constitutionally Protected Rights</u>

<u>(Against Defendants the City of Valley and Chambers County Board of Education)</u>

101.    Plaintiffs incorporate by reference paragraphs 1 through 10, 24, 26-27, and 30 through 84.

102.    Upon information and belief, the City of Valley and the Board of Education tacitly adopted and/or implemented and condoned a custom or policy to stop citizens from, and to retaliate against citizens for, exercising their constitutionally protected rights of peaceable assembly and free speech, including by silently and unobtrusively expressing their views on important publicly

contested issues at the November 15, 2023 Board of Education meeting. This custom or policy resulted in the Defendants' constitutional violations against Plaintiffs complained of herein.

103.    The deprivation of the Plaintiffs' First Amendment Rights was premeditated and coordinated in advance of the November 15, 2023 meeting by and among the City of Valley, the Chambers County Board of Education, the Valley Policy Department, and the Arresting Officers, as described more specifically in the following paragraphs.

104.    The prohibition against displaying signs (no matter how small, and even silently and unobtrusively) was a *per se* violation of the First Amendment.

105.    To provide the Arresting Officers with a pretext to arrest the Plaintiffs in order to stop them from, and in retaliation for, exercising their First Amendment rights, the Board of Education and/or the City of Valley drafted the Valley MOU or caused it to be drafted.

106.    On November 9, 2023 (the Thursday before the Board of Education meeting on Wednesday, November 15), Robin Butts, Human Resources Manager for the City of Valley, sent an email to Defendant Mike Reynolds, Police Chief of the City of Valley Police Department, attaching a draft of the Valley MOU bearing the document number 4872-1967-6296 v.1.pdf, with the Subject line: "Mayor wants you to review and let him know by 10 AM Monday Morning please."

107.    On the first page of the Valley MOU, in the recital that "***the citizens*** in certain situations could be guilty of disorderly conduct or other criminal offenses" (emphasis added), the words "the citizens" referred to the "citizens at the last two board meetings who have disrupted in one way or another the conduct of business at the board meetings," identified as such two recitals above that in the Valley MOU. This was an oblique but clear reference to the Plaintiffs and other LTAD members.

108.    Upon information and belief, on or about November 9, 2023, the City of Valley and/or the Board of Education also published or caused to be published the Short-Form Notice, which stated that there had "been disruptions at previous Board of Education meetings which were not held in the City of Valley" and warned that "[b]reaches of the peace and/or disorderly conduct will not be tolerated."

109.    Upon information and belief, on or around November 10, 2023, the Board of Education and/or the City of Valley also published the Notice (or caused it to be published), the first paragraph of which warned that "Breaches of the peace and/or disorderly conduct will not be tolerated."

110.    The Notice further provided:

"The Board asks that any protesters adhere to the following guidelines during the meeting:

1.  Leave any placards *and/or signs* outside the board room/auditorium . . . ."

(Emphasis added.)

111.    Thus, by means of the Valley MOU that Defendant Riley caused to be transmitted to Defendant Reynolds, the Notice and the Short-Form Notice posted on the Internet and, upon information and belief, other communications, one or more senior policy-making officials of the City of Valley, directly or indirectly, expressly or implicitly, informed the Police Chief for the City of Valley and the Valley Police Department of the proposed restrictions to enforce against protestors at the November 15, 2023 Board of Education meeting, including persons who carried "signs" or "*could be* guilty of disorderly conduct or other criminal offenses" (emphasis added).

112.    The Valley MOU was part of a pattern of actions that the Defendants named in this Count took to retaliate against and intimidate LTAD members, such as transferring Ms. Smith

from LaFayette High School, and to stop them from continuing to exercise their constitutionally protected rights of free expression and peaceable assembly.

113.    As a result of the unconstitutional policy or custom of Defendants Chambers County Board of Education and the City of Valley, which was enforced by the Arresting Officers during the November 15, 2023 School Board meeting, the Plaintiffs have suffered mental anguish, physical and emotional pain and suffering, loss of liberty, financial loss (due to, among other things, the incurrence of attorneys' fees to defend themselves against baseless charges brought without probable cause), and other grievous and continuing injuries and damages in an amount to be proven at trial.

## COUNT IV

### Claim for Violation of the First Amendment Under 42 U.S.C. § 1983

(Against Defendants Riley, Chambley, Finch, Reynolds,
Davis, Daniel, Meacham, Smith, Harris, and Shirey)

114.    Plaintiffs incorporate by reference paragraphs 1 through 20, 27, and 30 through 84.

115.    The prohibition against carrying or displaying "signs" (an ambiguous term, covering messages in writing and images no matter how small, even silently and unobtrusively) was a *per se* violation of the First Amendment. Such a prohibition was unreasonable in light of the purpose of the Board of Education meetings; rather than being a narrowly tailored time, place or manner restriction, it targeted speech that the Defendants disfavored.

116.    The Plaintiffs engaged in silent protest, which is a form of protected speech.

117.    By preventing the Plaintiffs from silently protesting at the November 15, 2023 meeting of the Board of Education, Defendants, acting under color of law, violated the Plaintiffs' clearly established First Amendment rights.

118.    The Defendants named in this Count committed the misconduct described above willfully and with malice and reckless indifference to the rights of others.

119.    As a result of the conduct of Defendants Riley, Chambley, Finch, Reynolds, Davis, Daniel, Meacham, Smith, Harris, and Shirey referred to in this Count, the Plaintiffs have suffered mental anguish, physical and emotional pain and suffering, and other grievous and continuing injuries and damages in an amount to be proven at trial.

<u>COUNT V</u>

<u>Claim for Violation of the ADA</u>

(By Plaintiff Ratchford Against Defendants Chambers County,
<u>the Chambers County Board of Education, and Defendant Weldon in her official capacity)</u>

120.    Plaintiff Ratchford incorporates by reference paragraphs 1 through 9, 22, 24-25, 27, 29-30, 61, 64, and 77.

121.    Under the ADA, Ms. Ratchford is a "qualified individual" eligible to participate in and benefit from the Chambers County and Chambers County Board of Education's services and who at all relevant times had, and who continues to have, a known disability.

122.    Ms. Ratchford has a disability within the meaning of the ADA.  She is unable to move on her own accord without the use of a wheelchair.

123.    Defendants Chambers County and the Chambers County Board of Education are public entities that, under the ADA, may not lawfully discriminate on the basis of disability.

124.    Upon information and belief, Defendant Chambers County Board of Education owns Langdale Auditorium.  As a public entity, Chambers County Board of Education is subject to the requirements of 42 U.S.C § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to disclination by any such entity.").  If

Langdale Auditorium is operated by a private entity and not by Chambers County Board of Education, it qualifies as a place of public accommodation subject to the requirements of 42 U.S.C § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.").

125.    When the public is invited to attend Chambers County Board of Education meetings, including the meeting on November 15, 2023, public accommodations for such meetings are services, programs, or activities provided by Defendants Chambers County Board of Education and Chambers County under 42 U.S.C. § 12132.

126.    By failing to provide Ms. Ratchford with suitable accommodations permitting her to enter and leave Langdale Auditorium for public events by means of ingress and egress reasonably comparable to those provided for non-disabled persons, Chambers County and the Chambers County Board of Education excluded her from participation in, or denied her the benefits of, the services, programs, or activities of a public entity, and discriminated against her by reason of her disability, in violation of Titles II and III of the ADA, 42 U.S.C. §§ 12132, 12182.

127.    Upon information and belief, Chambers County and the Chambers County Board of Education have long been on notice of the fact that Langdale Auditorium does not have a ramp or other reasonable accommodation for wheelchair-bound persons to enter and exit the building without undue inconvenience, assistance, and discomfort.

128.    Chambers County and the Chambers County Board of Education have hosted meetings and other events at Langdale Auditorium since the Board of Education meeting on November 15, 2023, some of which Ms. Ratchford would have liked to attend and would have

attended had there been a reasonable accommodation (such as a suitable ramp) allowing her (and other wheelchair-bound persons) to enter and exit the building in a wheelchair. Upon information and belief, from time to time Langdale Auditorium will continue to be a venue for meetings and events to which the public is invited, of the sort which Ms. Ratchford would attend if there were such a suitable accommodation.

129.    As a result of Defendants' conduct referred to in this Count, Ms. Ratchford has suffered mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages.

<u>COUNT VI</u>

<u>Claim for Violation of the Rehabilitation Act</u>

(Against Defendant Chambers County Board of Education and
<u>Defendant Weldon in her official capacity)</u>

130.    Plaintiff Ratchford incorporates by reference paragraphs 1 through 9, 22-24, 27, 29-30, 61, 64, and 77.

131.    Ms. Ratchford has a disability within the meaning of the Rehabilitation Act. She is unable to move on her own accord without the use of a wheelchair.

132.    Ms. Ratchford is a "qualified individual" eligible to participate in and benefit from the Chambers County Board of Education's services and who at all relevant times had, and who continues to have, a known disability.

133.    The Rehabilitation Act defines "program or activity" to include all of the operations of "a local educational agency (as defined in section 7801 of Title 20), system of vocational education, or other school system." 29 U.S.C. § 794(b)(2)(B). Defendant Chambers County Board of Education is a local educational agency, because it is "a public board of education or other public authority legally constituted within a State for either administrative control or direction of,

or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools." 20 U.S.C § 7801(30).

134.    Upon information and belief, Defendant Chambers County Board of Education and the Chambers County School District are the recipients of federal funds; under the Rehabilitation Act, Defendant Chambers County Board of Education may not discriminate on the basis of disability.

135.    By failing to provide Ms. Ratchford with suitable accommodations permitting her to enter and leave Langdale Auditorium for public events by means of ingress and egress reasonably comparable to those provided for non-disabled persons, the Chambers County Board of Education excluded her, by reason of her disability, from participation in, or denied her the benefits of a program or activity (or of programs and/or activities) receiving federal financial assistance, in violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794).

136.    As a result of Defendants' conduct referred to in this Count, Ms. Ratchford has suffered mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages.

<u>COUNT VII</u>

<u>False Arrest Claim Under the Common Law of Alabama</u>

(Against Defendants Reynolds, Davis,
<u>Daniel, Meacham, Smith, Harris, and Shirey)</u>

137.    Plaintiffs incorporate by reference paragraphs 1 through 10, 14-20, 27-28, 30, and 49 through 84.

138.    Defendants Reynolds, Davis, Daniel, Meacham, Smith, Harris, and Shirey unlawfully, maliciously, and willfully arrested the Plaintiffs without probable cause.

139.    This misconduct was objectively unreasonable, and Defendants named in this Count committed the misconduct willfully and with malice and reckless indifference to the rights of others.

140.    No police officer in the same situation and with the same information could reasonably conclude that there was probable cause to arrest the Plaintiffs for disorderly conduct under Alabama law.

141.    Among other things, there was no basis on which a reasonable officer could conclude that the Plaintiffs were disturbing a lawful assembly by protesting silently and peaceably, while the Board of Education meeting proceeded as planned, unimpeded.

142.    Nor was there a basis on which a reasonable officer could conclude that Ms. Ratchford and Ms. Smith were congregating with other persons in a public place and refusing to comply with a lawful order to disperse.  Any order to disperse by the Arresting Officers was unconstitutional, unlawful, and enforced selectively against the Plaintiffs because of their views and their membership in LTAD.  No such order, nor the supposed limitation on which it was based, was a narrowly tailored time, place, and manner restriction.

143.    As a result of the conduct of Defendants Reynolds, Davis, Daniel, Meacham, Smith, Harris, and Shirey, the Plaintiffs have suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, financial loss due to attorneys' fees, and other grievous and continuing injuries and damages as set forth above.

<u>COUNT VIII</u>

<u>False Imprisonment Claim Under the Common Law of Alabama and Ala. Code 1975 § 6-5-170</u>

(Against Defendants Reynolds, Davis,
<u>Daniel, Meacham, Smith, Harris, Shirey, and Spruill)</u>

144.    Plaintiffs incorporate by reference paragraphs 1 through 10, 14-21, 27-28, 30, and 49 through 84.

145.    Defendants Reynolds, Davis, Daniel, Meacham, Smith, Harris, Shirey, and Spruill deprived Plaintiffs of their personal liberty when they unlawfully arrested, restrained, and detained the Plaintiffs on November 15, 2023.

146.    In jailing the Plaintiffs without probable cause to believe that they had committed a crime, Defendants Reynolds, Davis, Daniel, Meacham, Smith, Harris, Shirey, and Spruill exercised their authority unlawfully, maliciously, and with reckless indifference to the rights of others.

147.    As a direct and proximate result of the conduct of Defendants Reynolds, Davis, Daniel, Meacham, Smith, Harris, Shirey, and Spruill and the unlawful imprisonment of the Plaintiffs, the Plaintiffs suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

<u>COUNT IX</u>

<u>Civil Conspiracy Claim Under 42 U.S.C. § 1983</u>

(Against Defendants Chambers County Board of Education, the
<u>City of Valley, Riley, Chambley, Finch, and Reynolds)</u>

148.    Plaintiffs incorporate by reference paragraphs 1 through 14, 24, 26-27, and 30 through 84.

149.    Acting under color of state law, Defendants Chambers County Board of Education, the City of Valley, Riley, Chambley, Finch, and Reynolds willfully conspired to retaliate against protestors, including the Plaintiffs, for exercising, and to stop them from continuing to exercise, their constitutional rights of freedom of speech and freedom of assembly, and they took overt steps to effectuate the objectives of their conspiracy, including by instigating Plaintiffs' false arrest without probable cause, in violation of their First and Fourth Amendment rights.

150.    By means of the various notices and MOUs as well as, on information and belief, other communications, Defendants Chambers County Board of Education, the City of Valley, Riley, Chambley, Finch, and Reynolds planned, orchestrated and coordinated the unconstitutional arrests of Plaintiffs, including by devising official pretexts.  Among other things, upon information and belief, Defendants Chambers County Board of Education, the City of Valley, Riley, Chambley, Finch, and Reynolds drafted and circulated (or caused to be drafted and circulated) the Short-Form Notice, the Notice, and the Valley MOU.  Upon information and belief, Defendants Chambers County Board of Education, Riley, Finch, and Chambley, in coordination with LaFayette Mayor Vines, drafted and circulated (or caused to be drafted and circulated) the LaFayette MOU.  Defendants took these steps to retaliate against protestors, including the Plaintiffs, for exercising, and to stop them from further exercising, their First Amendment rights.

151.    Upon information and belief, in furtherance of their conspiracy, at least once before the November 15, 2023 meeting, Defendants Chambley and Finch attempted to initiate the arrest of the Plaintiffs in retaliation for exercising, and to stop them from further exercising, their constitutional rights to free speech and freedom of assembly.

152.    Upon information and belief, in furtherance of the conspiracy to stop the Plaintiffs' protests and to retaliate against them for their previous protests, at the November 15, 2023 meeting, Defendant Chambley identified the Plaintiffs as protestors to Defendant Reynolds.

153.    As a result of Defendants' conduct referred to in this Count, which led to the Plaintiffs' arrest and subsequent prosecution, the Plaintiffs have suffered mental anguish, physical and emotional pain and suffering, loss of liberty, financial loss (due to, among other things, the attorneys' fees they were forced to incur to defend themselves against baseless charges brought without probable cause), and other grievous and continuing injuries and damages in an amount to be proven at trial.

<u>RELIEF SOUGHT</u>

Wherefore, the Plaintiffs request that this Court enter judgment against Defendants as follows:

(A)    On Counts I through IV and VII through IX and against all Defendants named therein, awarding compensatory damages in an amount to be proven at trial;

(B)    on Counts I through IV and VII through IX, awarding general damages in an amount to be proven at trial against all Defendants named therein;

(C)    on Counts I through IV and Count IX, awarding nominal damages against all Defendants named therein;

(D)    on Counts I, II and IV and Counts VII through IX, awarding punitive damages against Defendants Chambley, Finch, Riley, Reynolds, Davis, Daniel, Meacham, Smith, Harris, Shirey, and Spruill for their reckless or malicious conduct;

(E)    on Count V, awarding injunctive relief against Defendant Chambers County, Defendant Chambers County Board of Education, and Defendant Weldon requiring them, as soon as practicable, to provide a reasonable and suitable accommodation

for Ms. Ratchford and other wheelchair-bound persons to enter and exit Langdale Auditorium;

(F)    on Count VI, awarding injunctive relief against Defendant Chambers County Board of Education and Defendant Weldon to reasonably accommodate Ms. Ratchford's disability at events hosted by Defendants;

(G)    awarding the Plaintiffs the costs of this Action, including reasonable attorneys' fees to be assessed and in accordance with 42 U.S.C. § 1988 and 29 U.S.C. § 794; and

(H)    awarding such other relief as this Court deems just and appropriate.

<u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38.1, Plaintiffs demand a jury trial on all issues so triable.

Dated:    May 6, 2025                Respectfully Submitted,

_____
                                          Alison Nicole Mollman

(Attorney ID ASB-8397-A33C)
ACLU of Alabama
PO Box 6179
Montgomery, AL  36106
(510) 909-8908
amollman@aclualabama.org

WILLKIE FARR & GALLAGHER LLP

Bart Schwartz (NY Attorney ID 1471705) (*pro hac vice* pending)
Steven Ballew (NY Attorney ID 5513015) (*pro hac vice* pending)
Emily Wilson (NY Attorney ID 6089502) (*pro hac vice* pending)
Kelvin Zhou (NY Attorney ID 6184949) (*pro hac vice* pending)
787 Seventh Avenue
New York, NY  10019-6099
(212) 728-8000
bschwartz@willkie.com
sballew@willkie.com
ewilson@willkie.com
kzhou@willkie.com

*Counsel for Yolanda Ratchford and Tytianna Smith*