IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| YOLANDA RATCHFORD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:25-cv-00351-BL |
| | ) | |
| CASEY CHAMBLEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

The Plaintiffs, Yolanda Ratchford and Tytianna Smith, initiated this suit on May 6, 2025. (Doc. 1). Four motions to dismiss are currently pending. (Docs. 69, 78, 86, 102). One of the Plaintiffs' briefs also contained a motion for partial summary judgment. (*See* docs. 95, 119). On March 27, 2026, the Magistrate Judge recommended that the court grant one of the motions to dismiss (doc. 86), grant in part and deny in part the three other motions to dismiss (docs. 69, 78, 102), deny the motion for partial summary judgment (doc. 95), and dismiss two defendants from this action. Objections have been filed by both sides. (Docs. 120, 121, 122, 23).

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A district judge must "make a *de novo* determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to

which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."). A district court's obligation to "make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made" requires a district judge to "give *fresh consideration* to those issues to which specific objection has been made by a party." *United States v. Raddatz*, 447 U.S. 667, 673, 675 (1980) (internal quotations and citations omitted) (emphasis in *Raddatz*).

## I. The Plaintiffs' Objections

The Plaintiffs filed objections to the recommendation. (Doc. 120). In their first objection, the Plaintiffs challenge the Magistrate Judge's conclusion that qualified immunity applies to the false/retaliatory arrest claims. In their objections, the Plaintiffs argue for the first time that the Defendants lacked probable cause even under the anti-loitering statute. However, the Plaintiffs did not make this argument before the Magistrate Judge. "Arguments that are not raised before a magistrate judge cannot be raised for the first time as an objection to a report and recommendation." *Starks v. United States*, Nos. 09-CIV-22352 & 07-CR-20588, 2010 WL 4192875, at *3 (S.D. Fla. Oct. 19, 2010). The Plaintiffs' argument before the Magistrate Judge on the anti-loitering statute was that their "gestures were "expressive conduct" intended to send a message, and thus clearly protected by the

First Amendment," not that the officers lacked probable cause to arrest them for violating the statute. (Doc. 95 at 36).

The objection centers on the following portion of the recommendation:

> Chief Reynolds and the Defendant Officers allege they are entitled to qualified immunity because they had probable cause to arrest Plaintiffs under Alabama's antiloitering statute . . . . *Plaintiffs do not argue Chief Reynolds and the Defendant Officer lacked probable cause to arrest them for loitering with bandanas on their faces.*[49] Instead, Plaintiffs argue arresting them under the anti-mask law would have violated their clearly established constitutional rights to freedom of expression by penalizing them for silent protest.
>
> . . .
>
> [49] It is undisputed the BOE meeting was a public place. The complaint alleges Plaintiffs "covered their mouths with bandanas, as if they had been gagged." (Doc. No. 1 at ¶ 68.) *Plaintiffs do not argue silently protesting by placing a bandana over their mouths as if gagged was not "being masked" within the meaning of the loitering statute.*

(Doc. 119 at 38). The Plaintiffs assert that, in their briefing before the Magistrate Judge, they "differentiated their symbolic speech through the use of bandanas from being masked within the meaning of the Anti-Loitering Statute." They point out the following statement from their brief:

> [I]f here, the Court reviews the statutory definitions of the crimes for which the Arresting Officers claim they had arguable probable cause against the facts as they appear from the evidence before the Court, the Court must conclude that no reasonable jury could find that the Arresting Officers had arguable probable cause.

(Doc. 25 at 30). The court agrees with the Plaintiffs that, with this statement, they raised the general issue of whether their conduct fell within any statutory definition

of a crime; however, that is too general to have raised the argument that the Defendants lacked probable cause under the anti-loitering statute.

On the issue of the anti-loitering statute, in a section entitled "The Arresting Officers Had No Reasonable Basis to Believe that the Plaintiffs Were Violating the Loitering Statute or the Trespass Statute," the Plaintiffs stated as follows:

> While it is true that the Alabama loitering statute, Ala. Code § 13A-11-9(a)(4), prohibits "being masked" in a public place, it is not true, as the Valley Defendants go on to assert, that "Plaintiffs admit in three separate paragraphs that they masked themselves with bandanas at the November 15, 2023, meeting in order to draw attention to themselves."[10] *See* Valley Def. Br. at 11. In fact, paragraph 68 of the Complaint reads, in its entirety:
>
> > When they took their seats, Ms. Ratchford and Ms. Smith covered their mouths with bandanas, as if they had been gagged, ***to call attention to the fact that they were being restrained from making their views known***.
>
> (Emphasis added.)
>
> "There is a legally critical distinction between 'to draw attention to themselves' and 'to call attention to the fact that they were being restrained from making their views known.'"

(Doc. 95 at 34–35). The Plaintiffs construe this statement as asserting that their conduct did not fall within the meaning of the anti-loitering statute; however, in the context of the brief, this statement was made as part of the Plaintiffs' argument that their conduct was protected by the First Amendment regardless of whether it fell within the statute. Indeed, in the footnote included here, footnote 10, the Plaintiffs discussed a case in which the Eleventh Circuit invalidated a portion of the anti-

loitering statute as violative of the First Amendment; and immediately following the quote above, the Plaintiffs also discussed a case in which "the Eleventh Circuit explained what constitutes expressive speech that is protected under the First Amendment." (Doc. 95 at 35).

In their objections, the Plaintiffs attempt to transform the constitutional argument they clearly relied on before the Magistrate Judge into a plain-language factual argument, writing:

> Contrary to falling within the meaning of "being masked" under the Anti-Loitering Statute, the Complaint expressly alleges that Plaintiffs' purpose of using the bandanas was 'to call attention to the fact that they were being restrained from making their views known'—which is a First Amendment-protected expressive act—***rather than to hide their identities***, which is the type of conduct prohibited by the Anti-Loitering Statute.

(Doc. 120 at 7). In their briefing before the Magistrate Judge, when the Plaintiffs pointed out that their intent was expressive and was not to hide their identities or to draw attention to themselves, they did so to support a constitutional argument (that their conduct was protected by the First Amendment), not to argue that their conduct actually fell outside the anti-loitering statute.

Although a heading and portions of the Plaintiffs' briefly generally asserted that they did not commit a crime, the Plaintiffs did not specifically challenge the Defendants' argument that the Plaintiffs violated the anti-loitering statute. The Plaintiffs make this argument for the first time in their objections citing dictionary

definitions and legislative history never before mentioned. Before the Magistrate Judge, the Plaintiffs chose to argue solely that their conduct was protected by the First Amendment; the Magistrate Judge examined that argument and ultimately found it insufficient to overcome qualified immunity. The court will adopt the finding of the Magistrate Judge on this point.

The Plaintiffs further argue in their objections that "the Anti-Loitering Statute was not the scripted reason to prevent and retaliate against Plaintiffs' free speech." (Doc. 120 at 8). However, as explained in the Magistrate Judge's recommendation, "the any-crime rule . . . insulates officers from false-arrest claims so long as probable cause existed to arrest the suspect for some crime, even if it was not the crime the officer thought or said had occurred." *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). (Doc. 119 at 35–36).

The Plaintiffs' second objection centers on the Magistrate Judge's finding that "the MOUs did not contain viewpoint specific sign prohibitions, and neither [of the MOUs] applied to the November 15, 2023 BOE meeting." (Doc. 119 at 29). The Plaintiffs argue that the MOUs should not be disregarded because they were a custom or policy tacitly adopted by City policymakers. The undersigned cannot discern what impact this objection, if correct, would have on the outcome of the recommendation. The Magistrate Judge found that, even though the MOUs were not in place at the time of the November 15, 2023, BOE meeting, the BOE Notice

alone was an unconstitutional viewpoint-based speech restriction sufficient to support the Plaintiffs' claims. The Magistrate Judge also found that there were sufficient allegations of a custom or policy of constitutional violations to support the Plaintiffs' *Monell* claims.

This objection appears to only impact the claims against BOE President Finch. In concluding that the Plaintiffs failed to state any claims against BOE President Finch, the Magistrate Judge rejected the Plaintiffs' argument that the Defendants who took "unlawful and unconstitutional actions against Plaintiffs" at the November 15, 2023, BOE meeting did so in part based on the MOUs, which were the product of President Finch's work. The Magistrate Judge found that the MOUs were not unconstitutional restrictions and were not in place at time of the meeting and thus that the Plaintiffs failed to allege causation with respect to Finch. By arguing in their objections that the City policymakers adopted the MOUs as a policy, the Plaintiffs still fail to establish why that adoption is Finch's fault. The Plaintiffs argue that "there was a tacit adoption of the Valley MOU . . . which, along with the BOE Notice and the Valley Notice, served as a driving force for Plaintiffs' arrests." (Doc. 120 at 11). They further argue that "the Valley Notice, in addition to the BOE Notice and the Valley MOU, served as a veiled threat to arrest protestors, specifically LTAD members, on fabricated disorderly conduct charges." (Doc. 120 at 12). Even assuming that the MOUs contained unconstitutional speech restrictions, they were

not in place at the time of the arrest. The Valley MOU was not signed. Moreover, as the Magistrate Judge reasoned, the Plaintiffs do not say that Finch directed the policymakers to do anything based on the MOU or personally deprived the Plaintiffs of their constitutional rights. (Doc. 119 at 29, 60). Although Finch may have participated in the creation of the MOUs, because those MOUs were not actually rules in place at the time of the meeting, the Plaintiffs cannot hold Finch liable for their arrest. The "driving force" and "veiled threat" arguments are insufficient to establish causation. When the "moving force" of a constitutional violation is a municipal custom or policy adopted by policymakers, the court can hold a municipality liable under *Monell*. *See Grech v. Clayton Cty.*, 335 F.3d 1326, 1330 (11th Cir. 2003). But that is not a basis for holding Finch as an individual liable.

Third, the Plaintiffs' object to the finding that they "fail[ed] to cite any supporting factual allegations" that their arrests were carried out willfully, maliciously, or in bad faith. In their briefing before the Magistrate Judge, the Plaintiffs only relied on conclusory allegations in asserting this exception to state-agent immunity. In their objections, the Plaintiffs begin by citing those same conclusory allegations, but then go on to cite the following specific allegations from their complaint:

> Plaintiffs allege that there were "[a]t least seven police officers" staffed at Langdale Auditorium on November 15, 2023, and that the extraordinary police presence intimidated them, even before the meeting started. Dkt. 1 ¶¶ 62, 67. They also allege that Defendant

> Reynolds and the Defendant Officers repeatedly singled them out for being protestors. Dkt. 1 ¶¶ 63, 66, 69, 73. Plaintiffs' humiliation continued at the jail. The officers at the jail forced Plaintiff Smith into a small holding cell, and Plaintiff Ratchford—who requires the use of a wheelchair—urinated on herself after an officer initially ignored her requests for a restroom. Dkt. 1 ¶¶ 80–81. The officer first told Plaintiff Ratchford that she would have to wait because he was doing paperwork, before wheeling her around from cell to cell, none of which could accommodate her wheelchair. Dkt. 1 ¶ 81.

(Doc. 120 at 13). Even ignoring the fact that the Plaintiffs failed to cite these specific factual assertions in their briefing before the Magistrate Judge, these allegations are still insufficient to establish that Chief Reynolds, the Defendant Officers, and Jail Watch Commander Spruill violated the the Plaintiffs' constitutional rights willfully, maliciously, or in bad faith, such as to defeat state agent immunity for the false arrest and false imprisonment claims. "The malice exception to State-agent immunity cannot be triggered merely because the agent acted negligently or even recklessly; instead, the agent must have acted with a design or purpose to inflict injury without reasonable justification." *Ex parte Pinkard*, 373 So. 3d 192, 202 (Ala. 2022) (quotation marks omitted). Bad faith "is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty . . . through some motive of self-interest or ill will." *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So.2d 916, 924 (Ala.1981); *see also Ex parte Turner*, 40 So.2d 132, 136 (Ala. 2002). The Plaintiffs fails to make clear how the Defendants did anything more than their

responsibilities in arresting and imprisoning them. The court will overrule all of the Plaintiffs' objections.

## II. Defendant Chambers County Board of Education's Objections

Defendant Chambers County Board of Education also filed objections. (Doc. 121). The BOE argues that the Plaintiffs have not adequately stated a *Monell* claim or a conspiracy claim based on constitutional violations under § 1983. However, the BOE fails to challenge a specific factual finding or legal conclusion contained in the recommendation; it merely restates the arguments that it made in its motion to dismiss (doc. 69), which the Magistrate Judge already considered in the recommendation.

## III. The Valley Defendants' Objections

The Valley Defendants (City of Valley, Leonard Riley, Charles Reynolds, Chris Daniel, Christopher C. Davis, Lorenzo Harris, Michael Meacham, Stacy Shirey, David G. Smith, and Ricky Spruill) also filed objections. (Doc. 122). To support some of their objections, the Valley Defendants argue that the Magistrate Judge erred by relying on allegations based "upon information and belief." The Valley Defendants quote the United States District Court for the Northern District of Alabama as follows: "For purposes of a 12(b)(6) motion to dismiss, allegations based 'upon information and belief' do not have to be taken as true." *Bd. of Trs. of*

*the Univ. of Ala. in Huntsville*, No. 5:14-cv-02029-HGD, 2016 U.S. Dist. LEXIS 185263, at *6 (N.D. Ala. Nov. 4, 2016). That quote, in context, reads as follows:

> In *Twombly*, the Supreme Court emphasized a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. Factual allegations in a complaint need not be detailed but "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S.Ct. at 1964-65 (internal citations and emphasis omitted). For purposes of a 12(b)(6) motion to dismiss, allegations based "upon information and belief" do not have to be taken as true. *Mann v. Parker*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965 (declining to take as true the conclusory allegation "upon information and belief" that the companies had entered a conspiracy without enough facts to make that statement plausible)).

*Id.* Therefore, allegations are not invalidated merely because they are based upon "information and belief." As the Magistrate Judge explained in the recommendation, factual allegations based on information and belief may lend plausibility to a claim so long as the allegations are factual (rather than legal conclusions), the allegations are not merely conclusory, and the plaintiff's stated "belief" is premised on facts that make the allegations plausible. (Doc. 119 at 3, 19) (citing *Sosa v. Martin Cnty., Fla.*, No. 20-12781, 2023 WL 1776253, at *9 (11th Cir. Feb. 6, 2023)). The Magistrate Judge's recommendation consistently applied this principle. The Valley Defendants state that the recommendation "appears, at times, to question Plaintiffs' use of the term ['information and belief'], often disparaging its use only when describing motives." (Doc. 122 at 7). However, the

recommendation only disregarded allegations that were conclusory or unsupported by specific facts. (*See, e.g.*, doc. 119 at 50) ("This lone allegation about Superintendent Chambley's motivation is conclusory, but not because the words 'information and belief' precede it. Rather, her stated 'belief' about Superintendent Chambley's motive is no more than a conclusory assertion Superintendent Chambley transferred her because of her LTAD activities.").

### A. Count III: Prior Restraint and Retaliation Against the City of Valley

Turning to their individual objections, the Valley Defendants first argue that the Magistrate Judge erred by failing to recommend dismissal of Count III, the First Amendment retaliation claim (and prior restraint claim) against the City of Valley.[1] The City of Valley argues, as it did before the Magistrate Judge, that there is no

---

[1] The Magistrate Judge concludes that the City of Valley is not entitled to dismissal of the prior restraint claim in Count III because, in its briefing, the City of Valley "treat[ed] Count III as a retaliatory arrest claim only." (Doc. 119 at 56). In their objections, the Valley Defendants again only address the prior restraint claim brought in Count IV against the individual Valley Defendants, although they do state in a footnote as follows:

> [T]o the extent the R&R is right in that Count III contains both prior restraint and retaliatory arrest claims (Doc. 119 at p. 56), the Court should apply all Valley Defendants' arguments made under Count IV (and vice versa) to the proper claims, however they are organized or labeled in the Complaint by the Plaintiffs. It was error for the R&R not to do so. Substance should trump form here.

(Doc. 122 at 26, n.14). The Defendants' arguments as to the prior restraint claim in Count IV are that the Valley Defendants did not do enough to be tied to the constitutional violation perpetrated on the Plaintiffs because they merely enforce the law, that the BOE Notice was a constitutional speech regulation, that probable cause defeats the claim, and that they are entitled to qualified immunity. (Doc. 79 at 20–27; doc. 122 at 19–29). For the reasons stated throughout this order, each of these arguments lack merit in general, whether applied to the individual Defendants or the City of Valley. The court agrees with the Magistrate Judge that the prior restraint claim in Count III against the City should survive past the motion-to-dismiss stage.

causation because the actions attributable to it were not enough: The Valley Notice did not reference signs or masks but merely stated that "disorderly conduct will not be tolerated," and the City of Valley simply posted officers at the November 15, 2023, meeting to preserve order and in case criminal conduct were to take place. However, as the Magistrate Judge reasoned, the Plaintiffs' factual allegations plausibly show that the City of Valley, through its mayor and police chief, adopted a policy of using Valley police to enforce the BOE's anti-sign policy; and because the BOE Notice's anti-sign policy was unconstitutionally viewpoint-discriminatory on its face, the single instance of the City of Valley enforcing that policy against the Plaintiffs suffices to establish an unconstitutional municipal policy caused their injuries. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1295 n.3 (11th Cir. 2024) ("[M]unicipalities and other local governments may be . . . directly liable under § 1983 for constitutional violations if the injury stems from the government's enforcement of a policy or custom."). Specifically, Valley's police officers, led by Valley's police chief, enforced BOE's Notice against the Plaintiffs as follows: Mayor Riley personally forwarded the BOE Notice to Chief Reynolds, and Chief Reynolds, after learning the Plaintiffs were protestors, personally led the Valley police department's charge to enforce the BOE Notice's anti-sign policy against them. The Magistrate Judge specifically addressed this issue, writing: "Though Valley did not itself create a policy prohibiting protestors from having signs,

Plaintiffs plausibly allege that by personally forwarding the BOE Notice to Chief Reynolds, Mayor Riley participated in inducing him to use Valley police to enforce the BOE Notice's viewpoint-discriminatory sign policy." (Doc. 119 at 58).

The Valley Defendants further argue that, under the Supreme Court's holding in *Mount Healthy City School District Board of Education v. Doyle*, "if Defendants acted as they are alleged to have acted, in part, because they found Plaintiffs' conduct to be disruptive and illegal under Alabama law, and Defendants would have acted similarly even without the retaliatory motive alleged, there can be no First Amendment violation." (Doc. 122 at 12). The Valley Defendants fault the Magistrate Judge for not addressing "the impact of Mount Healthy's holding and reasoning in the context of the Valley Defendants' defense." (Doc. 122 at 12). However, this argument is misguided. *Mount Healthy* applies to retaliatory employment actions, not retaliatory arrests. As the Eleventh Circuit has explained:

> [C]ourts have identified two general approaches to retaliation claims against governmental actors, with the particular approach chosen dependent on the type of alleged retaliation at issue. One approach, typically used when a governmental employee claims that he was fired because he engaged in First Amendment activity, looks to whether the defendant governmental employer's retaliatory motivation was the but-for cause of the adverse employment decision. If not—that is, if the defendant would have taken the same action had there not also been a retaliatory animus motivating that conduct—then the defendant is not liable. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87, 97 S. Ct. 568, 575–76, 50 L.Ed.2d 471 (1977); *see Lozman*, 585 U.S. at ——, 138 S. Ct. at 1955.

> The second approach—taken when the governmental defendant has utilized the legal system to arrest or prosecute the plaintiff—has been to require the plaintiff to plead and prove an absence of probable cause as to the challenged retaliatory arrest or prosecution in order to establish the causation link between the defendant's retaliatory animus and the plaintiff's injury. *Nieves*, 587 U.S. at ——, 139 S. Ct. at 1726; *Hartman*, 547 U.S. at 260–61, 265–66, 126 S. Ct. at 1704, 1706–07.

*DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). The Plaintiffs' First Amendment retaliation claim against the City of Valley is based on the arrest, not based on adverse employment action. The Valley Defendants' argument about *Mt. Healthy* falls flat.

The Valley Defendants also argue that, under the "second approach" described in *DeMartini*, the retaliatory arrest claim cannot succeed against the City of Valley if the officers had probable cause to arrest under anti-loitering statute. The Valley Defendants argue that "the two findings—one that probable cause existed for the arrests and the other that the arrests (and what led up to them) violated the First Amendment—are logically and legally inconsistent." (Doc. 122 at 13).[2] However, as the Magistrate Judge explained, the presence of probable cause should *generally* defeat a First Amendment retaliatory arrest claim and plaintiffs *ordinarily* must prove lack of probable cause as part of their case in chief, but the Supreme Court has

[2] This objection applies only to the City of Valley because the Magistrate Judge did in fact find that the existence of probable cause defeats the Plaintiffs' claims against the individual defendants involved in the arrest (Riley, Reynolds, Davis, Daniel, Meacham, Smith, Harris and Shirey). (See doc. 119 at 40).

recognized an exception to this rule in certain limited circumstances. *Lozman v. Riviera Beach*, 585 U.S. 87, 90–91 (2018).

Although the Valley Defendants did argue in their briefing before the Magistrate Judge that the existence of probable cause defeats the First Amendment Retaliation claim against Riley, Reynolds, Davis, Daniel, Meacham, Smith, Harris and Shirey (the individual defendants), they never made this argument with respect to the City of Valley. In their motion to dismiss, with respect to the retaliation claim against the City of Valley (Count III), the Valley Defendants only stated as follows: "This Count of the Complaint appears to be the same or similar First Amendment retaliation claim addressed above in the context of individual capacity claims. The City of Valley adopts and incorporates by reference all the arguments made in that context, except of course with respect to qualified immunity." (Doc. 79 at 20). The Valley Defendants then went on to make their causation argument (discussed above). They did not mention *Lozman*. In their response brief, the Plaintiffs asserted generally that the *Lozman* exception applies. (Doc. 95 at 45–46). However, they did not discuss the applicability of each factor. In their reply brief, the Valley Defendants discussed the applicability of the *Lozman* exception. (Doc. 110 at 26–31). They argued specifically why the five *Lozman* factors did not apply in this case. However, they did so only in the context of the retaliation claim against Riley, Reynolds, Davis, Daniel, Meacham, Smith, Harris and Shirey (the individual

defendants). (Doc. 110 at 26–31). In the section concerning the retaliation claim against the City of Valley (Count III), the Valley Defendants simply reiterated their argument that the causation element is inadequately pled. (Doc. 110 at 35–38).

Based on the foregoing, the Magistrate Judge reasoned in the recommendation as follows:

> Valley's cursory, bulk reference to individual-capacity arguments is insufficient to connect those arguments to the *Monell* claim in a manner that permits meaningful review. For example, Valley has not demonstrated why the alleged existence of probable cause entitles it, as a municipality, to dismissal of Plaintiffs' claims. *See Lozman*, 585 U.S. at 87 (holding that, under certain circumstances, a plaintiff may maintain a First Amendment retaliatory arrest claim against a municipality even in the presence of probable cause for the arrest). The undersigned will not stitch together arguments from elsewhere on Valley's behalf. It is Valley's job to make its own case.

(Doc. 119 at 56, n.61). In other words, the Magistrate Judge applied the *Lozman* exception to the claim against the City of Valley because Valley failed to argue that *Lozman* did not apply.

The Valley Defendants object on this point: They assert that recommendation was "too restrictive in the way it often rejected Defendants' arguments that had not been, in its view, sufficiently raised or fleshed out in the Defendants' principal brief. The court disagrees. The Magistrate Judge correctly applied the principal that "[i]t is not the Court's duty to flesh out all possible arguments for [the parties] when considering a motion to dismiss, nor would it be appropriate for the [c]ourt to attempt to do so in the adversarial system upon which the federal judiciary operates."

*Moncrief v. City of Montgomery*, No. 2:23-cv-331-JTA, 2024 WL 4142655, at *7 n.12 (M.D. Ala. Sept. 10, 2024).

Because the Defendants did not argue that *Lozman* is inapplicable to the claims against the City of Valley, the court agrees with the Magistrate Judge's application of *Lozman* to the City. Although Valley presents a detailed argument in its objections that *Lozman* is not applicable, the court need not consider that argument here for the first time. "Arguments that are not raised before a magistrate judge cannot be raised for the first time as an objection to a report and recommendation." *Starks v. United States*, Nos. 09-CIV-22352 & 07-CR-20588, 2010 WL 4192875, at *3 (S.D. Fla. Oct. 19, 2010).[3]

### B. Count IV: Prior Restraint Against the Individual Defendants

With respect to the "prior restraint" claim in Count IV against the individual defendants, the Valley Defendants' objections largely repeat the arguments they made in their briefs, which the Magistrate Judge has already considered. They specifically challenge the recommendation in one place, writing: "While the R&R correctly found the general rule immunizing defendants from arrest-based claims

[3] Elsewhere in the recommendation, the Magistrate Judge declines to apply *Lozman* to Defendant Riley on the basis that the "Plaintiffs attempts no explanation why their allegations against Mayor Riley satisf[ied] all five factors." (Doc. 119 at 43). The difference that warrants the Magistrate Judge's application of *Lozman* to the City of Valley but not to Defendant Riley is that the Valley Defendants challenged the applicability of *Lozman* as to Defendant Riley, but not as to the City of Valley. (*See* doc. 110). The Plaintiffs are entitled to notice of the grounds for dismissal and an opportunity to respond. The City of Valley is not entitled to dismissal on a basis not raised and argued in relation to its motion to dismiss. *See Neitzke v. Williams*, 490 U.S. 319, 329–30 (1989).

where probable cause exists applied in Counts I and II, it erred by not also applying that same general rule to Counts III and IV which claimed injury based on those same arrests." (Doc. 122 at 23, n.12). The Defendants state that "just as when the presence of probable cause for arrest undermines the argument that the arrest was actually motivated by a retaliatory intent, the same probable cause undermines the argument that the arrest occurred as a result of an unconstitutional motive allegedly behind the prior restraint." (Doc. 122 at 26).

In the recommendation, the Magistrate Judge stated that "Mayor Riley, Chief Reynolds, and the Defendant Officers have not presented a cogent argument or cited controlling authority that Plaintiffs must demonstrate an absence of probable cause to overcome qualified immunity on a prior restraint claim." (Doc. 119 at 28, n.34, 27) ("[The Valley Defendants] do not explain how probable cause . . . applies in the specific context of a qualified immunity defense to a prior restraint claim, as opposed to claims for unlawful or retaliatory arrests."). The Defendants provide new law and argument to bolster this point in their objections, but the court need not consider those additions. *See Starks v. United States*, Nos. 09-CIV-22352 & 07-CR-20588, 2010 WL 4192875 ("Arguments that are not raised before a magistrate judge cannot be raised for the first time as an objection to a report and recommendation."). The Magistrate Judge already addressed the Defendant's argument that they did not enact the prior restraint, but merely enforced it. (Doc. 119 at 27) ("[B]y enforcing the

BOE Notice, the[] [Valley Defendants] went beyond merely enforcing disorderly conduct laws. They enforced an unconstitutional, viewpoint-discriminatory prior restraint."); *see Johnson v. City of Atlanta*, 107 F.4th 1292, 1295 n.3 (11th Cir. 2024) ("[M]unicipalities and other local governments may be . . . directly liable under § 1983 for constitutional violations if the injury stems from the government's enforcement of a policy or custom."). Moreover, prior restraint claims are not defeated by the existence of probable cause to arrest because the preemptive prevention of speech (i.e. the mere threat of arrest) without constitutional justification is a constitutional violation whether or not an arrest ever takes place. *See United States v. Frandsen,* 212 F.3d 1231, 1236–37 (11th Cir. 2000) ("A prior restraint of expression exists when the government can deny access to a forum before the expression occurs."); *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 884 (11th Cir. 2000) (finding that the plaintiffs' evidence "that they were threatened with arrest for engaging in free speech activities is evidence of an actual and concrete injury wholly adequate to satisfy the injury in fact requirement of standing" to bring their prior restraint claim).

Next, the Defendants argue that the BOE Notice was not an unconstitutional prior restraint because it did not discriminate based on viewpoint and that no constitutional violation was clearly established. Defendant Chambley makes these

same arguments. Therefore, the court will address the Valley Defendants' arguments together with Defendant Chambley's arguments below in section IV.

The Valley Defendants argue that the Magistrate Judge erred by not upholding the Plaintiff's burden to establish that the Defendants' conduct was violative of clearly established law. (Doc. 122 at 29). The Defendants do not flesh this argument out any further. They simply point out that their brief on the motion to dismiss stated: "nothing in November of 2023 would have told [Defendants], either as a mayor or a law enforcement officer, in any particularized manner, that their alleged conduct was a 'clearly established' First Amendment violation in this context." (Doc. 79 at 27).

The Magistrate Judge reasoned on this point as follows:

> Though the burden is on Plaintiffs to overcome Defendants' initial qualified immunity showing, Plaintiffs have met that burden here. As previously explained, Plaintiffs plausibly allege the BOE Notice violated their clearly established First Amendment rights. Mayor Riley, Chief Reynolds, and the Defendant Officers have not presented a cogent argument or cited controlling authority that Plaintiffs must demonstrate an absence of probable cause to overcome qualified immunity on a prior restraint claim.

(Doc. 119 at 28 n.34). The Magistrate Judge found that the individual defendants did not present any qualified immunity argument, using their probable cause argument as an example. (*See* doc. 119 at 270) ("To the extent Mayor Riley, Chief Reynolds, and the Defendant Officers are attempting to assert some other basis for qualified immunity by obliquely referencing 'case law and arguments set out above

in other sections' of their brief, their argument is too cursory to allow meaningful review. For example, they do not explain how probable cause (which is discussed in other sections of their brief) applies in the specific context of a qualified immunity defense to a prior restraint claim."). The Defendants have not identified a flaw in the Magistrate Judge's reasoning.

### C. Count IX: Conspiracy

Finally, the Valley Defendants argue that the Magistrate Judge erred in allowing the conspiracy claim to move forward. They re-state their arguments that the Plaintiffs' claim fails because it is based on "information and belief" and that the Defendants only agreed to enforce valid laws and thus did not conspire to violate constitutional rights. Those arguments are addressed by the analyses above. The Valley Defendants also object to the Magistrate Judge's decision not to consider arguments incorporated by reference, specifically their qualified immunity argument. Their qualified immunity argument as to the conspiracy claims fails for the same reason that it fails as to the underlying claims, which is addressed below: The Plaintiffs allege a violation of a clearly established constitutional right.

## IV. Defendant Casey Chambley's Objections

Finally, Defendant Casey Chambley filed objections to each of the three claims against him. (Doc. 123). For the reasons set forth below, the court will overrule the objections.

**A. Count II: Retaliatory Arrest**

Chambley argues that the causation element of the retaliatory arrest claim against him is insufficiently plead because there are no allegations "as to how he allegedly assisted in or caused the arrests." (Doc. 123 at 10). In the recommendation, the Magistrate Judge found that

> 4. Plaintiffs Plausibly State a § 1983 First Amendment Retaliatory Arrest Claim Against Superintendent Chambley, And He Is Not Entitled to Qualified Immunity[53]
>
> . . . .
>
> Plaintiffs plausibly allege Superintendent Chambley created the BOE Notice and provided it to Mayor Riley and Chief Reynolds intending Valley police to enforce the BOE Notice's restriction against protestors.[55] (*See, e.g., id.* at ¶¶ 56–57.). Further, viewed in the light most favorable to Plaintiffs, the complaint plausibly supports an inference Chief Reynolds threatened and targeted Plaintiffs for violating a BOE "rule" against signs only after Superintendent Chambley pointed out to him Plaintiffs were protestors. (*Id.* at ¶¶ 66–73.) Finally, Plaintiffs plausibly allege they were arrested for violating the BOE Notice's viewpoint-based rule against signs, the very rule Superintendent Chambley created and perpetuated, and for which he secured and facilitated police enforcement.
>
> . . . .
>
> [53] . . . . Superintendent Chambley allegedly (1) drafted and forwarded the BOE Notice with the stated intent that it would apply to protestors, and (2) personally involved himself in Plaintiffs' arrest by directing Chief Reynolds's attention to them and informing him they were protestors. . . .
>
> . . . .

> [55] Plaintiffs also allege Superintendent Chambley created the BOE Notice for Valley police to enforce after he unsuccessfully attempted to have the sheriff "arrest the LTAD protestors for holding signs," learned that only municipal police could arrest protestors, and failed to secure the execution of the Valley MOU prior to the November 15, 2023 BOE meeting.

(Doc. 119 at 46). The only specific objection Chambley makes on this point is: "Even if Chambley is alleged to have pointed out who the Plaintiffs were, there is no allegation that Chambley told anyone to arrest the Plaintiffs." (Doc. 123 at 10). The court agrees with the Magistrate Judge that there are sufficient allegations in the complaint to support the causation element of the Plaintiffs' claim against Chambley.

Chambley also argues that the Plaintiffs "were arrested pursuant to valid arrest warrants because they violated state law." (Doc. 123 at 10). However, as the Magistrate Judge pointed out in the recommendation, "Superintendent Chambley did not argue for dismissal of the First Amendment retaliatory arrest claim based on probable cause." (Doc. 119 at 44 n. 53). Since he did not present this argument in his briefing, the court need not address it now. *See Starks*, Nos. 09-CIV-22352 & 07-CR-20588, 2010 WL 4192875, at *3.

His qualified immunity argument on retaliation claim hinges on his argument that he either did no enforcing and that, even if he did, the rule he enforced was constitutional. For the reasons discussed below, that argument fails.

**B. Count IV: Prior Restraint**

With respect to Count IV, Chambley first argues that the BOE Notice did not compel or require any specific conduct. "As can be see[n] from the clear language of the notice, it simply requests or 'asks' that protestors leave signs outside." (Doc. 123 at 4). However, as the Magistrate Judge reasoned,

> Despite the words "asks" and "guidelines" in the BOE Notice, the complaint sufficiently alleges Chief Reynolds enforced the BOE Notice's sign restriction as a rule, not a mere request or suggested guideline. After learning Plaintiffs were protestors, he demanded they put away their signs, then arrested them for disorderly conduct because they refused to comply. He repeatedly stated he was enforcing the meeting's "rules" against signs. (Doc. No. 1 at ¶¶ 66, 69–74.)

(Doc. 119 at 23, 29).

Next, like the Valley Defendants, Chambley argues that the BOE Notice restricting the usage of signs was not viewpoint-based. (Doc. 123 at 4–8). "[V]iewpoint-based law goes beyond mere content-based discrimination and regulates speech based upon agreement or disagreement with the particular position the speaker wishes to express." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1241 (11th Cir. 2019). A law that singles out speech "based on the specific motivating ideology or the opinion or perspective of the speaker" facially discriminates against that viewpoint. *Vidal v. Elster*, 602 U.S. 286, 293, 144 S. Ct. 1507, 1514, 219 L. Ed. 2d 56 (2024) (quoting *Reed*, 576 U.S. at 168, 135 S.Ct. 2218 (internal quotation marks omitted); accord, *Brunetti*, 588 U.S.

at 394, 139 S.Ct. 2294 (explaining that a viewpoint-based trademark law "distinguishes between two opposed sets of ideas").

The Supreme Court has also found that a law can discriminate based on viewpoint in its practical operation. See *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011); *R. A. V. v. St. Paul*, 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). However,

> [w]hile the line between viewpoint-based and viewpoint-neutral content discrimination can be "slippery," *see* Corbin, Mixed Speech: When Speech Is Both Private and Governmental, 83 N. Y. U. L. Rev. 605, 651 (2008), it is in any event clear that a regulation is not viewpoint discriminatory (or even content discriminatory) simply because it has an "incidental effect" on a certain subset of views. *Ward*, 491 U.S. at 791, 109 S.Ct. 2746.

*Iancu v. Brunetti*, 588 U.S. 388, 418 (2019). Ultimately, "the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

The Magistrate Judge concludes that "[t]aking the complaint's allegations in the light most favorable to Plaintiffs, the BOE Notice is viewpoint-based because it expressly directs only 'protestors' to 'adhere to . . . guidelines' that included leaving signs outside the auditorium." (Doc. 119 at 23). Chambley argues that the Magistrate Judge

> interpret[s] the term "protestor" as a limiting phrase, because the court adds its own phrase "based on their views" to describe how a protestor

> is a particular type of speaker. . . . . In the BOE Notice there is no such limitation added to the phrase "protestor" describing a protestor as only someone who has one viewpoint and/or is opposed to something the BOE is espousing. Indeed, both protestors and counter-protestors are in fact "protestors.[")]

(Doc. 123 at 4–5).

Chambley and the Valley Defendants argue that the BOE Notice was both content neutral and viewpoint neutral. Chambley argues that [t]here was no limitation on content – such as limiting those who might be there expressing opinions on the teacher/employee awards being handed out at the meeting, the person elected Board president for the upcoming year, the hire of other routine personnel or the decision to consolidate schools." (Doc. 123 at 7). He further argues that it was not viewpoint-based: "[W]hat makes someone a 'protestor' is that they are engaged in expressive conduct in context (*e.g.*, a demonstration, picket, or public gathering." (Doc. 123 at 6). Chambley notes that the Plaintiffs do not allege they were "asked to put away their signs, asked to leave or were ultimately arrested while others who supported the BOE's decision to consolidate the high schools were allowed to bring signs into the BOE meeting, stay despite bringing in signs, be allowed to wear masks or otherwise engage in distracting behavior." (Doc. 123 at 7). The Valley Defendants similarly point out that "[n]owhere does the Complaint allege that the prohibition was designed to *allow* protests or signs or interruptions favorable to the BOE's positions or that Defendants in fact *allowed* protestors, signs

or disruptions coming from a favorable viewpoint to interrupt the November 15, 2023, meeting with impunity." (Doc. 122 at 25). The court finds that the Plaintiffs have plausibly alleged viewpoint discrimination.

Based on the background alleged in the complaint, which is taken as true, it is clear that the BOE Notice was directed at one group, LTAD, which was united by their viewpoint in opposition to the consolidation of Chambers County high schools. Although, technically speaking, the word "protestor" can refer to "counter-protestors" and demonstrators with diverse viewpoints, the Plaintiffs have plausibly alleged that the BOE Notice itself was viewpoint-based because it was intended to target only the Plaintiffs and their group of "protestors." The history between the parties makes this clear. Since its formation in late 2022, the Plaintiffs' public advocacy group, LTAD, had been protesting at Board of Education Meetings. (Doc. 1 at 9) ("On or around August 23, 2023, September 27, 2023, and October 25, 2023, LTAD held peaceful protests at Board of Education meetings."). At these meetings, the Plaintiffs had multiple run-ins with law enforcement and Board of Education officials, which is clearly what caused the Board of Education to regulate the conduct of LTAD at its meetings, specifically including the prohibition on signs, under which the Plaintiffs were arrested:

- At all of the meetings at which they protested, "[w]hen the LaFayette police officers told [LTAD members] that they could not chant or hold signs in the meeting, they stepped outside." (Doc. 1 at 10).

- "[B]efore the October 25, 2023 meeting, Defendants Chambley and Finch, who disagreed with the viewpoints of the LTAD protestors, told Jeff Nelson, the Sheriff of Chambers County, to arrest the LTAD protestors for holding signs. Sheriff Nelson responded that only the municipal police departments (of LaFayette or Valley (wherever the meeting was held)) had jurisdiction to arrest demonstrators." (Doc. 1 at 10).

- "Before the October 25, 2023 meeting, Sheriff Nelson had approached Ms. Smith and her brother, Dr. Travis Smith (who was also a member of LTAD), and told them that they were no longer allowed to protest, including by holding signs during the Board of Education meetings." (Doc. 1 at 10).

- The Lafayette MOU, which was signed October 25, 2023, "provided that the LaFayette Police Department would be responsible for preventing any disruptions by protesters at future Chambers County School District Board of Education meetings, and that LaFayette police officers were responsible for confiscating the signs of demonstrators." (Doc. 1 at 10). "Pursuant to the LaFayette MOU, during the October 25 Board of Education meeting in LaFayette, LaFayette police officers did, in fact, remove signs." (Doc. 1 at 11).

- "At a November 6, 2023 LaFayette City Council meeting, council members raised concerns about the LaFayette MOU and the conduct of LaFayette police officers during the October 25, 2023 Board of Education meeting." (Doc. 1 at 11).

- "[B]efore a demonstration at a Board of Education meeting on November 15, 2023, one individual told an LTAD demonstrator: 'I support you anyway, I just like my job.'" (Doc. 1 at 12).

- "[I]n anticipation of the November 15, 2023 Board of Education meeting in Valley," the BOE officials drafted a new MOU, the Valley MOU, and circulated it to law enforcement and City officials. (Doc. 1 at 12). The Valley MOU stated, in part: "WHEREAS, the Board desires to maintain an appropriate atmosphere for the conduct of its business at its regularly scheduled board meeting to be held at the Langdale Auditorium in Valley, Alabama; and, WHEREAS, there have been citizens at the last two board meetings who have disrupted in one way or another the conduct of business at the board meetings; and, WHEREAS, the City through its police

department enforces the laws in the City; and, WHEREAS, the citizens in certain situations could be guilty of disorderly conduct or other criminal offenses." (Doc. 1 at 13).

- On November 9, 2023, the City published a notice on its website and Facebook profile stating, in part, "[t]he Chambers County Board of Education will hold a meeting at the Langdale Auditorium in the City of Valley on Wednesday, November 15, 2023 at 5 P.M. EST. The City has been informed that there have been disruptions by protestors at previous Board of Education meetings which were not held in the City of Valley . . . . Breaches of the peace and/or disorderly conduct will not be tolerated." (Doc. 1 at 14).

- On November 10, 2023, the BOE published a notice on the Chambers County School District website stating, in part, "[t]he Chambers County Board of Education will hold a meeting at the Langdale Auditorium in the City of Valley on Wednesday, November 15, 2023, at 5:00 P.M. EST. . . . Breaches of the peace ***and/or disorderly conduct*** will not be tolerated. The Board asks that any protesters . . . [l]eave any placards ***and/or signs*** outside the board room/auditorium." (Doc. 1 at 14).

- "At least seven police officers" were at the November 15, 2023, BOE meeting. (Doc. 1 at 15). The Plaintiffs were the only LTAD members at the meeting. They were prohibited from bringing their signs into the auditorium, were warned when they covered their mouths with bandanas that signs were prohibited, and were eventually arrested for holding up pieces of paper during the meeting.

Based on the previous communications amongst the Defendants and interactions between the Defendants and LTAD, it is clear that the BOE Notice was intended specifically to restrict the anticipated demonstration by the members of LTAD at the November 15 meeting. The Defendants even admit in their objections that their actions in restricting the Plaintiffs' conduct was targeted regulation of LTAD based on its past conduct; they argue that, "[u]nder the reasoning of the R&R, public officials are powerless to enforce their own rules of decorum once a group

has acted disorderly in prior meetings and officials then want to stress their desire for rules of decorum to be properly observed in future meetings and enforced, if necessary." (Doc. 122 at 25). In disallowing "protestors" from holding signs, the BOE Notice was intended to target the members of LTAD.

It is possible that the Defendants' reason for targeting LTAD with the BOE Notice was merely because LTAD had repeatedly appeared and protested and were anticipated to protest on November 15, 2023, and the Defendants wanted to have an interruption-free meeting. However, there is no support for the Defendants' claim that members of LTAD "acted disorderly in prior meetings." Instead, according to the complaint, none of LTAD's prior protests at BOE meetings nor their demonstration at the November 15 meeting disrupted the meeting in any way. (Doc. 1 at 10, 11). It is thus questionable that the Defendants' publication of the BOE Notice was merely to "stress their desire for rules of decorum to be properly observed in future meetings and enforced." It is *plausible* that LTAD's "specific motivating ideology or the opinion or perspective of [its] speaker[s] [wa]s the rationale for the restriction" instead. *Rosenberger*, 515 U.S. at 829.

Notably, the Eleventh Circuit has stated that "suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268,

1280 (11th Cir. 2025). The Plaintiffs plausibly allege that the Defendants published the BOE Notice to prevent LTAD members from protesting because the LTAD members opposed the BOE's plan to consolidate the high schools, and not merely to protect the decorum of the meeting.

This case is at the motion to dismiss stage; all the Plaintiffs must do at this point is plausibly allege viewpoint discrimination. *See Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1223 (11th Cir. 2019) ("We cannot say whether these claims will ultimately succeed, but Cambridge Christian has plausibly alleged enough to enter the courtroom and be heard."). If, with the benefit of discovery, it becomes clear that the Defendants published and enforced the BOE Notice merely to protect the decorum of their proceeding, and not to silence the Plaintiffs' viewpoint, the Defendants may seek a judgment as a matter of law.

Chambley also argues that the Plaintiffs cannot overcome the clearly established prong of their qualified immunity defense. The Magistrate Judge found that the Plaintiffs have met the clearly established requirement by asserting that the Defendants enforced a viewpoint-based prior restraint. The recommendation states that:

> targeting particular speakers (here, protestors) based on their views is, definitionally, unconstitutional viewpoint discrimination. *See Barrett*, 872 F.3d at 1225 n.10. Furthermore, "[t]he right to be free from viewpoint-based discrimination is a foundational—and long clearly

> established—constitutional right." *Huggins*, 151 F.4th at 1279 n.7; *see also Rosenberger*, 515 U.S. at 828 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys . . . . In the realm of private speech or expression, government regulation may not favor one speaker over another."); *McDonough*, 116 F.4th at 1322 (tracing the history of the standard for regulating speech in limited public forums which, while unclear and shifting at times with respect to treatment of content regulation, has never allowed viewpoint discrimination).

(Doc. 119 at 26).

Chambley argues that "[t]he phrase 'protestor' does not appear to have been interpreted by the Eleventh Circuit as meaning that it applies to only one viewpoint so as to make it a viewpoint-based restriction." (Doc. 123 at 9). While it may not be clearly established that a speech restriction targeting "protestors" discriminates on the basis of viewpoint, it is clearly established by "broad statements of principle" articulated in binding case law that publishing and enforcing a speech restriction targeted at one group because of that group's viewpoint is a First Amendment violation. *See Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021) ("A plaintiff may show that a right was 'clearly established' through: . . . a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right"); *see also Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1325 (11th Cir. 2024) ("[The defendants] were—had to have been—on notice that excluding [plaintiff] from the volunteer ministry program based on his views about baptism was unlawful."); *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1321

(11th Cir. 2005) ("[T]he law is clearly established that the state cannot engage in viewpoint discrimination—that is, the government cannot discriminate in access to the forum on the basis of the government's opposition to the speaker's viewpoint."). The Plaintiff's right to be free from a viewpoint-based speech restriction at the November 15 BOE meeting and to peacefully protest was clearly established in 2023. As stated above, a violation of this right has not yet been proven, but is plausibly alleged based on the history between these parties and the other allegations showing that the Notice was published specifically to prevent LTAD from expressing its view at the BOE meeting.

**C. Conspiracy**

Finally, Chambley argues that the Magistrate Judge erred in allowing the conspiracy claim to move forward. He repeats his argument that the Plaintiffs have not stated any claims against him. That assertion is addressed by the analyses above.

## CONCLUSION

After careful review of the file and upon consideration of the recommendation of the Magistrate Judge, it is **ORDERED** as follows:

1. The court **ADOPTS** the recommendation of the Magistrate Judge (doc. 119) as modified herein.

2. The motion to dismiss (doc. 69) filed by the Chambers County Board of Education is **GRANTED IN PART** and **DENIED IN PART**.

3. The motion to dismiss (doc. 78) filed by the City of Valley, Mayor Riley, Chief Reynolds, the Defendant Officers (Chris Daniel, Christopher C. Davis, Lorenzo Harris, Michael Meacham, Stacy Shirey, and David G. Smith), and Jail Watch Commander Spruill is **GRANTED IN PART** and **DENIED IN PART**.

4. The motion to dismiss (doc. 86) filed by BOE President Finch is **GRANTED**.

5. The motion to dismiss (doc. 102) filed by Superintendent Chambley is **GRANTED IN PART** and **DENIED IN PART**.

6. Plaintiffs' motion for partial summary judgment (doc. 95) is **DENIED**.

7. Count I is **DISMISSED** on grounds that Chief Reynolds and the Defendant Officers are entitled to qualified immunity.

8. Count II is **DISMISSED IN PART** as follows:

a. As to the retaliatory arrest claim against Chief Reynolds and the Defendant Officers on grounds of qualified immunity.

b. As to the retaliatory arrest claim against Mayor Riley for failure to state a claim upon which relief can be granted.

c. As to the retaliatory arrest and employment retaliation claims against BOE President Finch for failure to state a claim upon which relief can be granted.

d. As to Smith's employment retaliation claim against Superintendent Chambley for failure to state a claim upon which relief can be granted.

9. Count IV is **DISMISSED** as to BOE President Finch.

10. Counts V and VI are **DISMISSED** for failure to state a claim upon which relief can be granted.

11. Count VII is **DISMISSED** on grounds that Chief Reynolds and the Defendant Officers are immune under state law.

12. Count VIII is **DISMISSED** on grounds that Chief Reynolds, the Defendant Officers, and Jail Watch Commander Spruill are immune under state law.

13. Count IX is **DISMISSED** as to BOE President Finch.

14. BOE President Finch and Jail Watch Commander Spruill are dismissed from this action, as no claims remain against them.

15. This matter will proceed on the following remaining claims:

a. Count II as to the retaliatory arrest claim against Chambley.

b. Count III against the City of Valley and the BOE.

c. Count IV against Riley, Chambley, Reynolds, and the Defendant Officers.

d. Count IX against Riley, Chambley, Reynolds, the BOE, and the City of Valley.

16. This case is **REFERRED BACK** to the Magistrate Judge for further determination and recommendation as may be appropriate.

**DONE** and **ORDERED** on this the 11th day of September, 2026.

**BILL LEWIS**
UNITED STATES DISTRICT JUDGE